(March 6, 1888.)

## INNIS v. BOLTON ET AL.

### [17 Pac. 264.]

SUFFRAGE—AUTHORITY OF LEGISLATURE.—The legislative assembly of the territory, having authority concurrent with Congress, may legislate upon the subject of suffrage, observing, of course, the constitutional limitations, and also the restrictions imposed by Congress.

TEST OATH—ACT CONSTITUTIONAL.—The act of the legislative assembly of the territory of Idaho, passed at its thirteenth session, creating additional disqualifications for voting, and prescribing a test oath as a mode of ascertaining the qualifications of persons offering to vote, is not in violation of the constitution of the United States.

SUFFRAGE AS A RIGHT—MAY BE ABRIDGED OR WITHDRAWN.—The right of suffrage is not a natural right, nor an unqualified personal right, but in a territory is a right conferred by law, which may be abridged or withdrawn by the authorities that conferred it, subject to constitutional limitations and restrictions.

(Syllabus by the court.)

APPEAL from District Court, Bear Lake County.

Richard Z. Johnson, for Appellant.

No brief on file.

Ensign & Stull, for Respondents.

The act in question is not in conflict with any provision either of the constitution or statutes of the United States. At all subsequent elections (that is, after the first election) in any territory, the qualifications of voters and of holding office shall be such as may be prescribed by the legislative assembly of each territory. (U. S. Rev. Stats., sec. 1860; Idaho Rev. Stats., 27.) The right of suffrage is not a natural right, nor is it an absolute, unqualified, personal right. It is a right derived in this country from constitutions and statutes. (McCrary on Elections, sec. 3; *Huber v. Reiley,* 3 Cold. (Tenn.) 569; *Anderson v. Baker,* 23 Md. 531; Brightley on Election Cases, 27; *Blair v. Ridgley,* 41 Mo. 63, 97 Am. Dec. 248, and note; Brightley on Election Cases, 83.) The qualifica-

tions of voters are not uniform in the states. Some states require payment of taxes, many registration. (Mc-Crary on Eelctions, sec. 7; *Capen v. Foster*, 12 Pick, 485, 23 Am. Dec. 632, and note; Brightley on Election Cases, 51; *Hawkins v. Carrall Co.*, 50 Miss. 735; *State v. Baker*, 38 Wis. 71.) Whenever legislative enactments prescribing the right to vote have been held invalid it has been because they were in conflict with the provisions of a constitution. (*McCafferty v. Guyer*, 59 Pa. St. 109; Brightley on Election Cases, 44; *Page v. Allen*, 58 Pa. St. 388; Patterson v. Barlow, 60 Pa. St. 54; *People v. Canaday*, 73 N. C. 198, 21 Am. Rep. 465; 1 Story on the Constitution, c. 9, secs. 581, 582.) There is nothing in the first amendment to the federal constitution which can give protection to those who practice what is forbidden by the statutes as criminal, on the pretense that their religion requires or sanctions it. (*Reynolds v. United States*, 98 U. S. 145.)

BRODERICK, J.—This action was commenced in the district court in and for Bear Lake county. The complaint alleges "that, at a special election duly held in and for said county of Bear Lake, on the twentieth day of November, 1886, for the election of a county surveyor, in and for said county, said defendants were the judges of election for Paris election precinct in said county,.and being duly appointed and qualified as such judges, and acting as such, the defendants had the polls open for said election at the first ward schoolhouse, in said Paris precinct, between the hours of 8 o'clock in the forenoon and 7 o'clock in the evening of said day. That this plaintiff then was a male inhabitant of said county and territory, over the age of twenty-one years, and a native-born citizen of the United States, and then resided, and, for the space of more than four months and for more than twenty years immediately preceding the day of said election, had resided continuously in said territory, and in said county of Bear Lake, and in said Paris precinct. That, as said defendant then and there well knew, this plaintiff was not, at the time of said election, under guardianship, *non compos mentis*, or insane, and was not and had not been convicted of treason, felony or bribery in this territory, or in any other state or territory in the Union, or else-

where, and was not a bigamist or polygamist, and did not co-habit with more than one woman. That as an elector of said county and precinct, this plaintiff, while the polls were then and there open for the reception of votes as aforesaid, duly of-fered to the defendants, judges of said election as aforesaid, his vote or ballot for the election of said county surveyor for said county, and then and there requested defendants to receive and deposit the same. That this plaintiff being thereupon chal-lenged by an elector entitled to vote at said poll, and one of the defendants having declared to this plaintiff the general quali-fications of an elector, this plaintiff then and there declared himself duly qualified; whereupon, said challenge not being withdrawn, this plaintiff offered to take, and requested said defendants to administer to plaintiff, the following oath: 'I do solemnly swear that I am a male citizen of the United States, over the age of twenty-one years; that I have actually resided in this territory for four months last past, and in this county thirty days; that I am not a bigamist or polygamist; that I do not cohabit with more than one woman, and that I have not previously voted at this election. So help me God.' But said defendants then and there refused to administer, or permit this plaintiff to take said oath. That said defendants, and each of them, not regarding their duty as judges of said election, and intending to wrongfully deprive this plaintiff of the elective franchise at said election, wrongfully, willfully, and maliciously refused to receive or deposit said ballot, although they, and each of them, then and there well knew that plaintiff was a quali-fied voter, and entitled to vote at said election; whereby plaintiff was deprived of his vote at said election, to his damage in the sum of ten thousand dollars. Wherefore plaintiff demands judgment against the defendants for the sum of $10,000 and his costs and disbursements in this action." The defendants demurred on the ground that it appeared on the face thereof that the complaint did not state facts sufficient to constitute a cause of action. The demurrer was sustained, plaintiff declined to amend, and elected to stand upon the pleading. The court thereupon ordered the complaint dismissed, and judgment was rendered in favor of defendants for their costs. The plaintiff duly excepted and appealed from the judgment.

In 1885 the legislative assembly of the territory enacted what is commonly known as the "Test Oath Statute." Section 16 of the Thirteenth Session Laws, 106, reads as follows: "If any person offering to vote shall be challenged by any judge or clerk of the election, or any other person entitled to vote at the same poll, and either judge shall challenge any person offering to vote whom he shall know or suspect not to be qualified, one of the judges shall declare to the person so challenged the qualifications of an elector. If such person shall then declare himself duly qualified, and the challenge be not withdrawn, one of the judges shall then tender him the following oath: 'You do solemnly swear (or affirm) that you are a male citizen of the United States, over the age of twenty-one years; that you have actually resided in this territory for four months last past, and in this county thirty days; that you are not a bigamist or polygamist; that you are not a member of any order, organization, or association which teaches, advises, counsels or encourages its members, devotees, or any other person to commit the crime of bigamy or polygamy, or any other crime defined by law, as a duty arising or resulting from membership in such order, organization or association, or which practices bigamy or polygamy or plural or celestial marriage as a doctrine rite of such organization; that you do not either publicly or privately, or in any manner whatever, teach, advise, counsel or encourage any person to commit the crime of bigamy or polygamy, or any other crime defined by law either as a religious duty or otherwise; that you regard the constitution of the United States, and the laws thereof, and of this territory as interpreted by the courts, as the supreme law of the land, the teachings of any order, organization, or association to the contrary notwithstanding; and that you have not previously voted at this election, so help you God.' " It is contended on behalf of the appellant that this act is void—1. Because it is in violation of the first amendment to the constitution of the United States; and 2. Because it is in conflict with the act of Congress of March 22, 1882. Congress has the superior power to legislate for the territories upon this subject, as well as all others; but its policy has usually been to prescribe the qualification of electors at the first election after the organization of a territory, and thereafter allow the

legislative assembly of the territory, under certain restrictions and limitations, to regulate and fix the qualifications for the exercise of the elective franchise at all subsequent elections. Section 1860 of the Revised Statutes of the United States was in force at the time the territorial statute was enacted, and is as follows: "At all subsequent elections, however, in any territory hereafter organized by Congress, as well as at all elections in territories already organized, the qualifications of voters, and of holding office, shall be such as may be prescribed by the legislative assembly of each territory; subject, nevertheless, to the following restrictions on the power of the legislature, namely: 1. The right of suffrage and holding office shall be exercised only by citizens of the United States above the age of twenty-one years, and by those above that age who have declared on oath, before a competent court of record, their intention to become such, and have taken an oath to support the constitution and government of the United States; 2. There shall be no denial of the elective franchise, or of holding office, to a citizen on account of race, color, or previous condition of servitude; 3. No officer, soldier, seaman, mariner, or other person in the army or navy, or attached to troops in the service of the United States, shall be allowed to vote in any territory by reason of being on service therein, unless such territory is and has been for the period of six months his permanent domicile." It cannot be doubted for a moment that this act clearly delegates to the territories legislative power over the subject of suffrage, subject to the restrictions enumerated therein. But of course, like all other grants in the organic act, this was subject to the constitutional limitations upon the granting power, and it is equally true, as contended, that by the grant Congress did not and could not devest itself of the power subject to the same restrictions. The act quoted, except the last two subdivisions thereof, has been in force ever since the organization of the first of the now existing territories, and during all this time the power to fix the qualifications for voting and holding office has been a concurrent power of Congress and the territorial legislature; the power of the former being limited by the federal constitution, and the power of the latter being limited by the constitution and by the acts of Congress. March 22, 1882, Congress,

in the exercise of its power, passed an act, the eighth section of which is alike applicable to all the territories, and declares as follows: "Sec. 8. That no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any person described as aforesaid in this section, in any territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such territory or other place, or be eligible for election or appointment to, or be entitled to hold any office or place of public trust, honor or emolument in, under or for any such territory or place, or under the United States." Counsel contends that by this act Congress undertook to legislate upon the whole subject of disfranchisements growing out of polygamy, bigamy and unlawful cohabitation, and thereby, by implication, withdrew or revoked the former grant of legislative power to the territories. We are unable to find anything in the act itself to warrant this conclusion. The act creates additional disqualifications, and it is to that extent, we think, to be regarded as an amendment to the organic law. Repeal by implication is not favored, and we cannot believe it was the intention of Congress to take away the power over this subject delegated by section 1600 of the Revised Statutes, but think the intention was only to engraft or place another limitation upon that power. This view seems more in consonance with the policy heretofore pursued by the general government toward the territories. It is true that the Congress has the paramount right, and may directly legislate for the government of any territory, and may directly repeal or abrogate any act of the territorial legislature. But it is also true that when Congress confers power upon the legislative assembly of a territory, and, in pursuance of this power, laws are enacted for the government of the people thereof, such enactments must be respected and upheld, unless clearly in conflict with some higher law.

The act of March 22, 1882, disfranchises bigamists polygamists, and those who are guilty of unlawful cohabitation, and disqualifies them from holding office. Section 2 of our statute contains substantially the same provision, as to this class of persons, and then further disqualifies all who counsel, advise, aid and abet in the commission of these offenses. Section 16 of

the statute (hereinbefore quoted) establishes the mode by which the disqualifications fixed by the former section and by the act of Congress may be ascertained and determined. We see no reason why the legislature, under the delegation of power, could not do this, and therefore conclude the power was concurrent, and, so far as this question is concerned, that these acts may stand together. This brings us to the consideration of a more important question, and one which we approach with a full appreciation of the responsibility. Is this territorial enactment in violation of the provisions of the federal constitution which guarantees religious freedom? It is at once conceded that if the statute prohibits or interferes in any substantial manner with the free exercise of religion then it is void and of no effect. The first amendment to the constitution declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," and in another place that "no religious test shall ever be required as a qualification to any office or public trust under the United States." These provisions are limitations upon the power of Congress, but it is readily conceded that Congress could not confer any authority upon a subordinate legislative body that it did not itself have and could not exercise. Therefore the inquiry will be confined to the one question. There is much general discussion of these constitutional inhibitions found in the books, but we have not been referred to any authority, nor do we know of any, upon the precise point involved in the case at bar. The authors, however, agree as to the object and purpose of the amendment, as well as to the causes which led to its adoption. "This amendment," says Judge Story, "cut off the means of religious persecution (the vice and pest of former ages), and of the subversion of the rights of conscience in matters of religion, which had been trampled upon, almost from the days of the apostles to the present age. The history of the parent country had afforded the most solemn warnings and melancholy instructions on this head; and even New England, the land of persecuted Puritans, as well as other colonies where the Church of England had maintained its superiority, would furnish out a chapter as full of the darkest bigotry and intolerance as any which could be found

to disgrace the pages of foreign annals." Judge Cooley, in his valuable work on Constitutional Limitations, 576, says: "Whatever, therefore, may have been their individual sentiments upon religious questions, or upon the propriety of the state assuming supervision and control of religious affairs, under other circumstances, the general voice has been that persons of every religious persuasion should be made equal before the law, and that questions of religious belief and religious worship should be questions between each individual man and his Maker. Of these questions human tribunals, so long as the public order is not disturbed, are not to take cognizance except as the individual, by his voluntary action in associating himself with a religious organization, may have conferred upon such organization a jurisdiction over him in ecclesiastical matters." Authorities might be multipled, but the result of all is that the government must not interfere with opinion, but may with conduct. Laws are made for the government of actions, and when the conduct and actions are criminal it is no excuse to say that these things, though forbidden by the law, are done in the name of religion. In *Reynolds v. United States,* 98 U. S. 166, Mr. Chief Justice Waite said: "So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Governments could exist only in name under such circumstances."

Perhaps the constitutional provision of the state of New York on this subject is as sound a commentary as can be given of religious freedom. "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind, and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state."

But counsel for appellant strenuously argued that the oath here prescribed and required to be taken does in effect interfere with the rights of conscience in religious matters, and thereby with free exercise of religion.  The most objectionable clause, and the one said to come within the inhibition, is as follows: "That you are not a member of any order, organization or association which teaches, advises, counsels or encourages its members, devotees or any other persons to commit the crime of bigamy or polygamy, or any other crime defined by law, as a duty arising or resulting from membership in such order, organization or association, or which practices bigamy or polygamy, or plural or celestial marriage, as a doctrinal rite of such organization."  This clause is undoubtedly open to criticism, but the intention of the legislature was to withdraw the right of suffrage from persons who encourage, aid and abet those who are endeavoring, not by constitutional methods, but against all law, to overthrow a sound public policy of the government, and one that has existed from its foundation.  In *Murphy v. Ramsey,* 114 U. S. 43, 5 Sup. Ct. Rep. 747, Mr. Justice Mathews, in construing the act of March 22, 1882, and speaking for the entire court, says: "Disfranchisement is not prescribed as a penalty for being guilty of the crime and offense of bigamy or polygamy; for, as has been said, that offense consists in the fact of unlawful marriage, and a prosecution against the offender is barred by the lapse of three years by section 1044 of Revised Statutes.  Continuing to live in that state afterward is not an offense, although cohabitation with more than one woman is.  But as one may be living in a bigamous or polygamous state, without cohabitation with more than one woman, he is in that sense a bigamist or polygamist, and yet guilty of no criminal offense.  So that, in respect to those disqualifications of a voter under the act of March 22, 1882, the objection is not well taken that represents the inquiry into the fact by the officers of registration as an unlawful mode of prosecuting for crime."

This case shows clearly that the test is not whether the persons excluded could be prosecuted for any crime, but whether the facts bring the parties within the scope of the act.  The decision rests, however, upon the ground that Congress may

take from the people of a territory any right of suffrage it
may have previously conferred, or at any time modify or
abridge it, as it may deem best. It should be observed, how-
ever, that the right of suffrage is not a natural right, nor an
unqualified personal right. The elementary writers do not in-
clude this right among the rights of property or persons. (2
Kent's Commentaries, 587.) But, as applied to a territory,
it is a right conferred by law, and may be modified or with-
drawn by the authority which conferred it, without inflicting
any punishment on those who are disqualified. Since the de-
cision of the case of *Murphy v. Ramsey, supra,* the power of
Congress over this subject has not been disputed, and, if we
are correct in the conclusion that the power of the territorial
legislature is concurrent, we see no reason why it may not im-
pose additional disqualifications in so far as it acts within
the scope of the authority committed to it. It has been well
said that "every government ought to contain, in itself, the
means of its own preservation." This, in our judgment,
enunciates the principle which lies at the foundation of this
whole question, and that must finally determine and set it at
rest. But the only question for us to determine is purely a
question of power. The courts are not warranted, nor are
they authorized, to abrogate laws merely because they may be
deemed unwise or impolitic. These are questions entirely
within the cognizance of the law-making branch of the govern-
ment, and with which the courts have nothing to do. A
statute will not be held void unless its invalidity is clear. If
unwise laws are enacted the remedy is with the people, who
must correct such legislation through the exercise of their
political power. As applied to this case, if the law is impolitic
or unjust, the legislature may repeal it, or the Congress may
abrogate it.

It will be conceded that if the statute is valid, as the plain-
tiff did not offer to negative all the disqualifications imposed,
his vote was not wrongfully rejected. Test oaths are not new
in this country. They have been prescribed at different times
in our history, and were justified by some real or supposed
public danger or public necessity. But our attention has not
been called to any similar to the one before us. The nearest

approach to it is the one prescribed by the registration officers of Utah, which will be found in the statement of the case of *Murphy v. Ramsey,* 114 U. S. 19, 5 Sup. Ct. Rep. 750. In that case the same objection was raised to the validity of the rule that is here insisted upon; but in that case the court held that the oath required was a proper mode of ascertaining the disqualifications imposed by the law, and that it did not interfere with the free exercise of religion. So we conclude in this case. If we are wrong in this, we congratulate ourselves that there is a court above us for the final adjudication of such questions, where our judgment may be corrected. To this we defer, confident that none will more cordially concur in the result.

Judgment affirmed.

Hays, C. J., and Buck, J., concur.

---

(March 6, 1888.)

Ensign & Stull, for Respondents.