(July 22, 1889.)

## WOOLEY v. WATKINS.

### [22 Pac. 102.]

CRIMINAL ORGANIZATION.—Orders, organizations, associations, or by whatever name called, which teach, advise, counsel, encourage, or practice the commission of crimes forbidden by law, are criminal organizations.

OVERT ACTS OF MEMBERS.—To become and continue to be members of such organizations are such overt acts of recognition and participation as make them *particeps criminis*, and as guilty in contemplation of law as though they actively engaged in promoting their unlawful objects and purposes.

ORGANIZATION OF TERRITORY—POWER CONFERRED.—The organic act confers concurrent power upon the territorial assembly of Idaho, to prescribe the qualifications and disabilities of voters of the territory, and to provide a mode by which those qualifications may be ascertained.

ACT OF CONGRESS—QUALIFICATIONS OF ELECTORS.—The act of Congress of March 22, 1882, touching the qualifications of electors in the territories, does not repeal sections 1851 and 1860 of the organic acts, which give the territorial legislature power to prescribe the qualifications of electors of the territory.

TERRITORIAL STATUTE NOT REPUGNANT TO CONSTITUTION OF UNITED STATES.—The territorial statute of February 3, 1885, which prescribes the qualifications of voters of the territory and provides that those qualifications may be ascertained by the oath of the electors, is not repugnant to the constitution of the United States. (*Innis v. Bolton,* ante, p. 442, 17 Pac. 264, affirmed.).
(Syllabus by the court.)

APPEAL from District Court, Bingham County.

This is an appeal by H. S. Wooley from a judgment rendered against him on the sixteenth day of October, 1888, in Bingham county, by the district court of the third judicial district of the territory of Idaho, dismissing his complaint and application for a writ of *mandamus* against C. N. Watkins, registrar of voters in Paris precinct, Bear Lake county, to compel him to register his name in the list of voters of that precinct. On the fifth day of October, 1888, the relator filed his petition, wherein he avers "that he is a male inhabitant and native-born citizen of the United States, over the age of twenty-one years; that he has resided in Bear Lake county, territory of Idaho, for ten years last past, and still resides there; that he is entitled to vote at any election for delegate to Congress, and for territorial, county, and precinct officers in said territory; that he is not under guardianship, *non compos mentis,* or insane; that he has not been convicted of treason, felony, or bribery in this territory, nor in any other territory or state in the Union; that he is not a bigamist or polygamist; that he does not teach, advise, counsel, or encourage any person or persons to become bigamists or polygamists, or to commit any other crime defined by law, or to enter into what is known as 'plural' or 'celestial' marriage; that he is not a member of any order, organization, or association which teaches, advises, or encourages its members or devotees, or any other persons, to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a rite or ceremony of any order, organization, or association, or otherwise; that C. N. Watkins is, and at all times herein mentioned has been, the duly

appointed and acting registrar of Paris precinct, Bear Lake
county, Idaho terri⁺ory; that on the twenty-ninth day of Sep-
tember, 1888, between the hours of 9 o'clock A. M., and 5 o'clock
P. M. (that being the time designated by said registrar for that
purpose), he appeared before the said registrar at the place ap-
pointed by him for the registration of voters, and then and
there offered to take and subscribe the oath prescribed by law,
and known as the 'elector's oath,' answer all questions, give all
the information under his control, take all the oaths, and do all
other acts and things required of him by law, and then and there
demanded of said registrar to register his name as a voter, as re-
quired by law; that the said registrar, in violation of his duty,
rejected his name, and refused to enter it upon the election reg-
ister, as required by law; that he has been for more than ten
years continuously a resident of the said Paris precinct, and en-
titled to registration therein, and that his name has not been
entered upon the election register in said precinct or elsewhere;
and prays that a writ of *mandamus* may be issued, directed to
the said C. N. Watkins, registrar as aforesaid, commanding him
to register his name in the manner prescribed by law."

Upon the presentation of this petition the court granted an
alternative writ of *mandamus*, directed to the said respondent,
returnable on the tenth day of October, 1888. On the return-
day of the writ the respondent filed an answer admitting certain
facts alleged in the petition, and denying others, as follows:
"The defendant admits all the facts set forth in the petition, ex-
cept that it is denied that he is an elector of the territory of
Idaho, for the following reasons, and none others; That the said
petitioner is a member of what is known as the 'Mormon church
in Idaho,' which organization teaches, advises, counsels and en-
courages its members to commit the crime of polygamy, and
other crimes defined by law, as a duty arising or resulting from
membership in such organization, and which practices bigamy or
polygamy as a doctrinal rite of such organization." On the
aforesaid return-day one H. M. Bennett filed his petition, pray-
ing the court to allow him to intervene on behalf of the public
or people of the territory in said proceeding, and to become a
codefendant, for the reasons stated in his petition, which are as
follows: "That said action is prosecuted for the purpose of

procuring a judgment of this court upon certain questions in which said petitioner is deeply interested; that his interest in said questions is adverse to the interests, desires, and wishes of both plaintiff and defendant; that the issue therein is only colorable; that said action is collusively brought and prosecuted; that the defendant did the acts complained of by and with the advice and procurement of the agents and leaders of the Mormon church; that the counsel for the plaintiff, and those interested with him, have either prepared or advised the preparation of the pleadings; that by the laws of this territory every member of an organization that practices or encourages the practice of crime among its members, or other persons, is ineligible to register, vote, or hold office; that within this territory there are many members of what is known as the 'Mormon church'; that it is an organization that, among other things, encourages the practice of bigamy among its members; that the plaintiff and defendant, and their attorneys, are members of the said Mormon church; that plaintiff's attorneys are not employed by plaintiff, but are retained and employed by the agents and representatives of the said Mormon church; that this action is collusively brought to procure a judgment of this court that will aid the leaders of said church in securing the registration of its members in violation of law; that said action is brought in such way that the agents, leaders, and representatives of said church may control both the prosecution and defense, and thereby prevent the examination and cross-examination of witnesses and parties further than they desire; that the Mormon church, acting through its agents and leaders, has controlled and directed every step in this matter on both sides, from the inception to the present time, and intend to continue such control; that defendant, before refusing to register the plaintiff, registered a large number of Mormons upon the same showing made by the plaintiff, and that he would have registered the plaintiff in like manner if he had not been by those interested with the plaintiff influenced not to do so, in order to bring this matter into court for the purpose hereinbefore stated." Upon the presentation and filing of this petition, and by the consent of the relator and respondent, H. M. Bennett, the petitioner, was by order of the court permitted to become a party respondent, and to show cause, if any there were, why the writ of *man-*

*damus* prayed for by the relator should not be issued. In pursuance of this order the said Bennett filed an answer on the same day, wherein he denies the relator's right to the relief prayed for on two grounds: "1. That the relator is not a qualified elector of Bear Lake county, Idaho, or of any county of this territory; and 2. That he is a member of what is known as the 'Church of Jesus Christ of Latter Day Saints,' commonly called the 'Mormon church'; that said church is an organization which teaches, advises, counsels and encourages its members to commit the crime of bigamy, polygamy, and other crimes defined by law, as a duty arising or resulting from membership in that organization, and that practices bigamy, polygamy or plural or celestial marriage as a doctrinal rite of such organization, and prays that the proceedings be dismissed," etc. The case was tried by the court below without a jury, upon the issues made by the aforesaid pleadings, and upon the evidence introduced by the relator and respondents respectively. Upon the issues and proofs so made and given the learned judge who presided at the trial, upon his findings of fact and conclusions of law, denied the writ, and entered judgment against the relator, with costs. From this judgment the relator appealed, and brings the record here for review.

Sheeks & Rawlins, for Appellant.

A person who withdraws from a church does not continue a member of it simply because he holds the same religious faith and tenets with the members of that church. (2 Wait's Actions and Defenses, 257; *Lucas v. Case,* 9 Bush, 297; *Groesbeeck v. Dunscomb,* 41 How. Pr. 302; *Den v. Bolton,* 12 N. J. L. 206; *Bouldin v. Alexander,* 15 Wall. 131.) The statute, being so construed as to disfranchise a person for past conduct or relations, and by requiring him, as a condition of the right to vote or hold any office, to establish his innocence of such past conduct or relation by means of an expurgatory test oath, is clearly in violation of the provisions of the constitution forbidding bills of attainder and *ex post facto* laws, and that no person shall be required to be a witness against himself. (*Cummings v. State of Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333; *Pierce v. Carskadon,* 16 Wall. 234, 239.) If a person is to be disfranchised because

guilty of some past conduct or relation, his guilt must be first judicially ascertained. The right of suffrage, when granted, will be protected. He who has it can only be deprived of it by due process of law. (*Minor v. Happersett,* 21 Wall. 176; *Huber v. Reily,* 53 Pa. St. 112; *Goetcheus v. Matthewson,* 61 N. Y. 420; *Green v. Shumway,* 39 N. Y. 418.)

R. Z. Johnson, Attorney General, and Smith & Smith, for Respondents.

The right of suffrage is purely conventional, and is granted or withheld according to the legislative will. (*Anderson v. Baker,* Bright. Elect. Cas. 27.) A test oath may be prescribed to be taken in order to ascertain if the party offering to register or vote possesses the qualifications prescribed by law to entitle him to vote. (*Blair v. Ridgely,* Bright. Elect. Cas. 83; *Innis v. Bolton,* ante, p. 442, 17 Pac. 264.) Society must possess this power as a means of self-preservation, and it may disfranchise persons, or prevent them from holding office, on account of the belief they may entertain upon a given subject. (*Clawson v. United States,* 114 U. S. 447, 5 Sup. Ct. Rep. 949.) This statute does not violate the first amendment to the constitution. It is in the power of the legislature to prohibit criminal practice, even if performed in the name of religion, by imposing penalties or disabilities. (*Reynolds' Case,* 98 U. S. 145; Cooley on Torts, 33.)

WEIR, C. J. (After Stating the Facts.)—The argument of this case at bar took a wide range, but the real questions involved lie in a narrow compass. They may be briefly stated in the following order: 1. Was the relator, at the time he demanded and was refused registration, a member of any order, organization, or association, and, if so, does that order, organization, or association teach, advise, counsel or encourage its members, devotees or other persons to commit the crime of bigamy or polygamy, or any other crime forbidden by law, as a duty arising from membership in such order, organization, or association? 2. Has the territorial legislature the power to legislate upon the subject of the elective franchise, and prescribe the qualifications of voters of the territory, and to declare

by statute that these qualifications shall be verified by the oath of the elector? 3. If so, did that legislative body exceed its power and infringe upon any of the provisions of the constitution of the United States in the exercise of that power?

The relator and respondents disposed of one of the questions of fact involved in the first proposition by a stipulation in writing, which was given in evidence upon the trial below. This stipulation is expressed in these words: "In this cause the following facts are agreed to: That the plaintiff is a native-born citizen of the United States, over twenty-one years of age, and has resided in Bear Lake county and Paris precinct for ten years; that he is not under guardianship, *non compos mentis,* or insane, and that he has never been convicted of felony, bribery, or treason; that he is not a bigamist or polygamist; that he does not teach, advise, counsel or encourage persons to commit the crime of bigamy or polygamy, or any other crime defined by law, or to enter into the relation known as the 'plural' or 'celestial' marriage, unless he does so by the bare fact that he is a member of the Mormon church; that he is a member of what is known as the 'Utah,' or regular, branch of the Mormon church, as distinguished from the reorganized, or 'Josephite,' branch of said church." By this agreement the fact is admitted that the relator was, at the time he applied for and was refused registration, a member of an order, or organization, or association, known as the "Utah," or regular, branch of the Mormon church. And the learned judge before whom the case was tried found from the evidence before him the fact that the order, organization, or association known as the "Utah," or regular, branch of the Mormon church, of which the relator, by the agreement above recited, admits that he is a member, teaches, advises, counsels and encourages its members, devotees and others to commit the crime of bigamy or polygamy, as a duty arising or resulting from membership in said order, organization, or association. From a careful review of the evidence recited by the judge in his findings we think it is amply sufficient to sustain his conclusions of fact on this point.

The consideration of the second proposition requires an examination of the scope of the legislative power given by Congress to the legislative assembly of the territory of Idaho. This

power is embraced in the organic act, and is to be found in sections 1851 and 1860 of the Revised Statutes of the United States. Section 1851 provides that "the legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the laws and constitution of the United States." Section 1860 declares that "at all subsequent elections, however, in any territory hereafter organized by Congress, as well as at all elections in territories already organized, the qualifications of voters and of holding office shall be such as may be prescribed by the legislative assembly of each territory, subject, nevertheless, to the following restrictions, . . . . namely: 1. The right of suffrage and of holding office shall be exercised only by citizens of the United States above the age of twenty-one years, and by those above that age who have declared on oath, before a competent court of record, their intention to become such, and have taken an oath to support the constitution and government of the United States. 2. There shall be no denial of the elective franchise, or of holding office, to a citizen on account of race, color, or previous condition of servitude. 3. No officer, soldier, seaman, mariner, or other person in the army or navy, or attached to troops in the service of the United States, shall be allowed to vote in any territory by reason of being on service therein, unless such territory is, and has been for the period of six months, his permanent domicile. 4. No person belonging to the army or navy shall be elected to or hold any civil office or appointment in any territory," except officers of the army on the retired list. That these sections of the organic act confer upon the territorial assembly of Idaho the power to legislate upon the question of suffrage, and to prescribe the qualifications of voters in the territory, subject to the conditions and restrictions contained in said act, is, we think, very plain; too plain, indeed, to admit of argument. But it is contended by the learned counsel for the appellant that, if they do confer such power, Congress afterward, by the act of March 22, 1882, having assumed to legislate upon the same subject, thereby withdrew or revoked that power, and that the territorial statute in question, having been passed after that withdrawal or revocation, is void for want of authority in the territorial assembly to pass it. This theory of interpretation is, in effect,

that Congress, by the act referred to, repealed those provisions of the organic act above recited, which confer power upon the territorial legislature to prescribe the qualifications and disabilities of voters of the territory. This view may commend itself for ingenuity, but cannot be recognized as sound. It is not a correct construction of the statutes referred to. If Congress intended that act to have any such effect, it would have so declared by express terms, and would not have left its intention to inference. Repeal by inference or implication is not favored in the law. It is held to occur only where different statutes cover the same ground, and there is a clear and irreconcilable conflict between the earlier and the later. (*Board v. Coal Co.*, 93 U. S. 619; *Movius v. Arthur*, 95 U. S. 144; *Arthur v. Homer*, 96 U. S. 137; *Chew Heong v. United States*, 112 U. S. 536, 5 Sup. Ct. Rep. 255.) A careful reading and comparison of the provisions of the act of Congress of March 22, 1882, and those of the act of the territorial assembly of February 3, 1885, which bear upon this subject, fail to develop such a clear and irreconcilable conflict between them as brings them within the rule above stated; but, on the contrary, plainly shows that the power conferred by Congress upon the territorial assembly to prescribe the qualifications and disabilities of voters in the territory is not absolute, and exclusive of the power of Congress to legislate upon the same subject, but is concurrent, and must be exercised subject to the constitutional limitations and restrictions imposed by Congress in the organic act.

The question involved in the third proposition is more difficult, and its solution requires careful thought. It is contended that those parts of the act of the territorial legislature which prescribe the qualifications of electors of the territory, and which require those qualifications to be verified by the oath of the elector, are in conflict with those provisions of the constitution of the United States which declare (1) that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; (2) that no religious test shall be required as a qualification to any office of trust under the United States; (3) that no bill of attainder or *ex post facto* law shall be passed; and (4) that no person shall be deprived of life, liberty, or property without due process of law. Those parts

of the territorial statute objected to as obnoxious to these pro-
visions read as follows: "No person who is a bigamist or polyga-
mist, or who teaches, advises, counsels, or encourages any per-
son or persons to become bigamists or polygamists, or to com-
mit any other crime defined by law, or to enter into what is
known as 'plural' or 'celestial' marriage, or who is a member of
any order, organization, or association which teaches, advises,
counsels, or encourages its members or devotees, or any other per-
sons, to commit the crime of bigamy or polygamy, or any other
crime defined by law, either as a rite or ceremony of such order,
organization, or association, or otherwise, is permitted to vote
at any election, or to hold any position or office of honor, trust,
or profit within this territory." (Rev. Stats. 1887, sec. 501.)
That part of the oath which the elector is required to take to ver-
ify that he is not within the scope of any of these disabilities is
as follows: "I do swear that I am not a bigamist or polygamist;
that I am not a member of any order, organization, or associa-
tion which teaches, advises, counsels, or encourages its mem-
bers, devotees, or any other persons to commit the crime of big-
amy or polygamy, or any other crime defined by law, as a duty
arising or resulting from membership in such order, organiza-
tion, or association, or which practices bigamy or polygamy, or
plural or celestial marriage, as a doctrinal rite of such organ-
ization; that I do not, and will not, publicly or privately, or in
any manner whatever, teach, advise, counsel, or encourage any
person to commit the crime of bigamy or polygamy, or any other
crime defined by law, either as a religious duty, or otherwise;
that I do regard the constitution of the United States, and the
laws thereof, and of this territory, as interpreted by the courts
as the supreme law of the land, the teachings of any order, or-
ganization, or association to the contrary notwithstanding."

More than three-quarters of a century ago that great lawyer
and eminent jurist, Chief Justice Marshall, announced a rule
of interpretation in cases involving alleged conflicts between
statutes and constitutions, which has ever since commanded
the highest respect of courts of justice. In *Fletcher v. Peck,*
6 Cranch, 87, he said: "The question whether a law be void
for its repugnancy to the constitution is, at all times, a question
of much delicacy, which ought seldom, if ever, to be decided in

the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." And more than fifty years ago Chief Justice Shaw, in considering this question in the *Wellington Case,* 16 Pick. 95, 26 Am. Dec. 631, used similar, if not stronger, language. In that case he declared that "the delicacy and importance of the subject may render it not improper to repeat what has been so often suggested by courts of justice, that when called upon to pronounce the invalidity of an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void unless the nullity and invalidity of the act are placed in their judgment beyond reasonable doubt." Again, Mr. Justice Washington, in rendering the opinion of the court in *Ogden v. Saunders,* 12 Wheat. 213, which involved a like question, said: "If I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt." This rule has been recognized and followed ever since by all the courts of last resort, state and federal, in the United States, in cases where they have been called upon to decide questions of this kind.

It will be observed, by a careful examination, that the law objected to as being repugnant to the first two provisions of the constitution above recited is not directed against the entertaining and free exercise of religious opinions and religious beliefs, but

is expressly aimed against such overt acts as violate the law in putting those opinons and beliefs into practice. While Congress, and, consequently, the territorial assembly, are deprived of all legislative power over mere opinion, they are left free to reach actions which are of a criminal nature, and are in violation of social duties, and subversive of good order. This distinction is stated with great clearness by the supreme court of the United States in the *Reynolds Case,* 98 U. S. 166, Chief Justice Waite, in delivering the opinion of the court, in a few appropriate and well-chosen illustrations demonstrated the distinction with great force. He there said that "laws are made for the government of actions, and, while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or, if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice? So here, as a law of the organization of society, under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious beliefs superior to the law of the land, and, in effect, to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." This reasoning and these illustrations apply with as much appropriateness and force to the case in hand as they do to the one cited, and we do not think it necessary to extend the length of this opinion by further discussion to establish the soundness of the distinction pointed out. Orders, organizations, and associations, by whatever name they may be called, which teach, advise, counsel, or encourage the practice or commission of acts forbidden by law, are criminal organizations. To become and continue to be members of such organizations or associations are such overt acts of recognition and participation as make them *particeps criminis,* and as guilty, in contemplation of criminal law, as though they actually engaged in furthering their unlawful objects and purposes.

To demonstrate the unsoundness of the position so earnestly urged by the appellant's counsel—namely, that the statute in question is in conflict with that provision of the federal constitution which declares against the passage of *ex post facto* laws, it is only necessary to compare the terms of the statute with what the courts have so often defined this provision to mean. They have decided time and again that an *ex post facto* law, within the meaning of this clause, is "one which is enacted after the offense has been committed, and which, in relation to it or its consequences, alters the situation of the accused to his disadvantage." (1 Kent's Commentaries, 409; *Cummings v. State of Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333; *Fletcher v. Peck,* 6 Cranch, 97; Sedgwick's Statutory and Constitutional Law, 2d ed., 558; *Pierce v. Carskadon,* 16 Wall. 234.) By a careful reading of the law objected to it will be observed that it treats of the present and future, and not of the past. Its operation is entirely present and prospective, and does not come within the scope of the above definition, and is in no sense *ex post facto*. It does not possess any of the features or characteristics of such a law. A law which simply prescribes the qualifications of voters and provides a mode of ascertaining those qualifications, does not, in our view, conflict with this clause of the constitution. "A state having the sovereign power to prescribe the qualifications of its electors may impose a test oath to be taken by every voter at the poll. This in no way violates the constitution of the United States." (*Blair v. Ridgley,* 41 Mo. 63, 97 Am. Dec. 248, and note; *Innis v. Bolton,* ante, p. 442, 17 Pac. 264.) It is also insisted that the law in question is null and void because it violates that provision of the constitution of the United States which declares "that no person shall be deprived of life, liberty, or property, without due process of law." The law under consideration does no more than prescribe the qualifications and disabilities of voters of the territory, and points out the mode by which these qualifications and disabilities shall be ascertained. It is difficult to see wherein these provisions are inconsistent with this clause of the constitution. "Among the absolute, unqualified rights of the states is that of regulating the elective franchise; it is the foundation of state authority. The right of suffrage is altogether a conventional one. It may be granted,

abridged, or taken away by the state government in its discretion, except so far as it is secured by the'state constitution." (*Ander-son v. Baker,* 23 Md. 531.) Upon a careful consideration of the whole case we are unable to discover that the statute in question is so clearly repugnant to the provisions of the constitution of the United States as would justify us in declaring it void on that ground, and the judgment of the court below must therefore be affirmed. Judgment affirmed. All concur.

BERRY, J., Concurring.—This case came up from the district court, Bingham county, on appeal from an order refusing a writ of *mandamus.* The only points relied on by the appellant, or urged at the hearing, are: "That the legislature of this territory had no authority to enact the law prescribing the qualification of voters, passed February 8, 1887, and especially sections 501 and 504 of that act." The provision especially objected to is a part of section 501 of the statutes of Idaho, which reads as follows: "No person who is a member of any order, organization, or association which teaches, advises, counsels, or encourages its members or devotees, or any other persons, to commit the crime of bigamy or polygamy, or any other crime defined by law, either as a rite or ceremony of such order, organization, or association, or otherwise, is permitted to vote at any election," etc. The oath which the applicant is required to take is prescribed by section 504. The two sections do not fully correspond. While the latter section only relates to acts and teachings enjoined as a doctrinal rite of such organization, the former prescribes the same acts and teachings enjoined as a doctrinal rite or ceremony of such order, organization, or otherwise. There is no question as to such discrepancy, and the issue is made wholly on the validity of section 501. The effect of restricting the question to section 501 is to remove from the case a point made on the argument, that the denial of the right to vote is based absolutely upon a "rite" or "ceremony" of a religious order. The words "or otherwise" clearly exclude such restricted construction. The statute applies to secular institutions as well as to religious; and as to all secular institutions the argument against the act, from a religious standpoint, will of course fail to apply. But the argument that the legislative

power to make membership in any organization a condition of right to vote would apply to either class alike had been withdrawn, as we shall hereafter see.

In considering the case the question as to whether the so-called "Church of Jesus Christ of Latter-Day Saints" is a religious organization might be a material question, but the court below held that such organization is a religious association. From such holding no appeal is taken. Hence, however pertinent that question, from the proof in the court below, might appear, it is not at this time before the court, and we shall consider it, with reference to the rights of its members, as a religious organization.

The power of the territorial legislature to determine who shall and who shall not vote at a territorial election is subject to both constitutional and congressional restriction. The legislative power of a territorial legislature extends to "all rightful subjects of legislation, not inconsistent with the constitution or laws of the United States." (U. S. Rev. Stats., sec. 1851.) Such legislature is expressly given the power to prescribe the qualifications of voters at all elections after the first. (U. S. Rev. Stats., sec. 1860.) This granted power is unrestricted, except as to certain specific exceptions, but neither of which exceptions touches this subject matter. It is not pretended that Congress has ever directly repealed this grant of power. If the legislature did not in fact have authority to enact this law, the power must either have been prohibited by the constitution, or it must have been withdrawn by implication, through some act of Congress. In fact, the able and exhaustive argument of the counsel for the appellant is confined to these two points. His constitutional argument centers in this: (1) That article 1 of the amendment of the constitution declares that Congress (and of course the territorial legislatures) "shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press." (2) That the third subdivision of article 6 of the constitution provides that "no religious test shall ever be required as a qualification to any office, or public trust under the United States." (3) That section 9, article 1 of the constitution provides that "no bill of attainder or *ex post facto* law shall be passed." (4) That "no

person shall be deprived of life, liberty or property, without due process of law"; and concludes (5) by citing the preamble to the constitution, declaring the purposes of that instrument to be "to secure the blessings of liberty to ourselves and posterity."

We are asked to construe these provisions of the constitution liberally, according to their purpose and design thus expressed. To do this it is necessary to consider the subject to which these provisions are to be applied. But before proceeding to do this, it may be observed that some, at least, of these constitutional provisions cannot apply to the case at bar. The fourth point can have no possible bearing upon this case. A law prescribing the qualifications of a voter does not even pretend to deprive a man of his life, liberty, or property, for such privilege is not essential to either. It is not even essential to citizenship, were the latter held to be within the meaning of either of these words. "Citizenship" and "suffrage" are by no means inseparable. Suffrage is not one of the inalienable rights with which men are endowed by their Creator; but it is altogether conventional. (*Anderson v. Baker,* Bright. Elect. Cas. 33.) Again, none of the elementary writers include right of suffrage as among the rights of property or person. (*Anderson v. Baker,* Bright. Elect. Cas. 34.) Such a law is in no sense a bill of attainder. It is not a punishment, or a means of punishment. It is not an *ex post facto* law; for it does not constitute or declare anything whatever, either past or present, to be a crime. It is not a test or qualification for office, either religious or otherwise, that we are considering. It is sufficient to consider that when the question shall arise. Nor is such law directed to the establishment of any religion; nor does it prevent, or tend to prevent, the free exercise of any religion; nor does it abridge, or tend to abridge, the freedom of speech or of the press. Under it a member of the organization in question may do and enjoy all he would do without it, except that he may not have the privilege of voting at an election. We know of no law making such act a religious rite or ceremony.

This would seem to be a fair, plain statement of the case, and of the different reasons against the appellant's construction of each of these constitutional provisions. But he still insists that there is something in the nature of this case calling for a more

liberal and enlarged construction. He assumes that any law which tends to turn men away from this organization in order that they may enjoy certain privileges tends to the subversion of the "blessings of liberty." We may suppose a case, perhaps, in which such a claim might be allowed, in which this preamble might be invoked to induce a more liberal construction. And, on the other hand, as in case of a claim to the exercise of license and crime, under the guise of "freedom of speech and of the press," may call for a more restricted construction. Whether such a declaration of purpose as this preamble contains calls for a liberal or a restricted meaning would in this point of view, depend entirely upon the nature of the subject demanding the construction. In other words, if unrestricted license to do all that this organization aims at doing tends to the increase of the "blessings of liberty," then the appellant might possibly invoke the declared purpose of the federal constitution, as an aid by which he would have these provisions construed. But, on the other hand, if those aims and purposes shall, on examination, be clearly against morals, public and private; clearly antagonistic to the laws of the land; clearly debasing to Christianity, and subversive of true liberty—then by the same rule a more restricted construction would be called for. Granting that in the case at bar the application of the rule as demanded by the appellant is correct, we may inquire, what are the aims and purposes of that organization which demands this immunity? Some of those aims and purposes are disclosed by the evidence given in the case. The notoriety which this organization has attained, might perhaps, warrant the courts in taking judicial notice of some of its features; but we refrain from going beyond its authoritative record, and refer only to part of its book, "Doctrine and Covenants," given as a whole in evidence upon the trial of this cause. Our reference must necessarily be brief and confined in scope.

On page 159 of that book, in what is there stated to be a "Revelation given through Joseph, the Seer, at Fayette, New York, January 2, 1831," we read: "Thus saith the Lord, your God, even Jesus Christ, the Great I Am, Alpha and Omega :.... Gird up your loins, and be prepared. Behold, the kingdom is yours, and the enemy shall not overcome. . . . . Behold, the

enemy is combined; and now I show unto you a mystery, a thing which is had in secret chambers, to bring to pass even your destruction in process of time, and ye knew it not. . . . . Fear not, for the kingdom is yours. . . . . The rich I have made; and all flesh is mine; and I am no respecter of persons. And I have made the earth rich; and behold, it is my footstool. Wherefore, again will I stand upon it, and I hold forth and deign to give unto you greater riches, even a land of promise, a land flowing with milk and honey, upon which there shall be no curse, when the Lord cometh. . . . . Ye shall have it for the land of your inheritance, and for the inheritance of your children forever, while the earth shall stand; and ye shall possess it again in eternity, and no more to pass away. But verily I say unto you that in time ye shall have no king nor ruler; for I will be your king, and watch over you. Wherefore, hear my voice, and follow me, and you shall be a free people, and ye shall have no laws but my laws, for I am your law-giver; and what can stay my hand? . . . . And again I say unto you that the enemy in the secret chambers seeketh your lives. Ye hear of wars in far countries, and you say there will soon be great wars in far countries; but ye know not the hearts of the men in your own land. I tell you these things because of your prayers; wherefore, treasure up wisdom in your bosoms, lest the wickedness of men reveal these things unto you by their wickedness, in a manner which shall speak in your ears with a voice louder than that which shall shake the earth. But if ye are prepared, ye shall not fear. And that you might escape the power of the enemy, and be gathered unto me, a righteous people, without spot and blameless; wherefore, for this cause, I gave unto you the commandment that ye should go to the Ohio; and there I will give unto you my law; and there you shall be endowed with power from on high; and from thence, whomsoever I will, shall go forth among all nations, and it shall be told them what they shall do; for I have a great work laid up in store; for Israel shall be saved, and I will lead them whithersoever I will; and no power shall stay my hand. And now I give unto the church in these parts a commandment that certain men among them shall be appointed, and they shall be appointed by the voice of the church, . . . . and this shall be their work: To govern the

affairs of the property of this church. And they that have farms that cannot be sold, let them be left, or rented, as seemeth them good. . . . . And that every man, both elder, priest, teacher, and also member, go to work with his might, with the labor of his hands, to prepare and accomplish the things which I have commanded. . . . . And go ye out from the wicked."

In another "revelation," January 5, 1831, page 163, addressed to one James Coville: "Hearken and listen to the voice of Him who is from all eternity to all eternity, the Great I Am, even Jesus Christ. . . . . Verily, verily, I say unto thee [Coville] thou art not called to go into the eastern countries, but thou art called to go to the Ohio. And, inasmuch as my people shall assemble themselves to the Ohio, I have kept in store a blessing such is not known among the children of men; and it shall be poured forth upon their heads, and from thence men shall go forth, into all nations. Behold, verily, verily, I say unto you that the people in Ohio call upon me in much faith, thinking I will stay my hand in judgment upon the nations; but I cannot deny my word; wherefore, lay to with your might, and call faithful laborers into my vineyard, that it may be pruned for the last time."

Again, in a "revelation," December 25, 1832, page 304, at a time in the history of the United States when "nullification" troubles in South Carolina had culminated in calling a convention, which was thought at the time to portend civil war, and such trouble seemed imminent, we have: "Verily, thus saith the Lord, concerning the wars that shall shortly come to pass, beginning at the Rebellion of South Carolina, which will eventually terminate in the death and misery of many souls. The day will come that war will be poured out on all nations, beginning at that place; for behold, the southern states shall be divided against the northern states, and the southern states will call upon other nations, even Great Britain, as it is called, and they shall also call upon other nations in order to defend themselves against other nations; and thus shall war be poured out upon all nations. And it shall come to pass after many days slaves shall rise up against their masters, who shall be marshaled and disciplined for war, and it shall come to pass also that the remnants who are left of the land shall marshal themselves, and shall become exceeding angry, and shall vex the gentiles with a

sore vexation; and thus, with the sword and by bloodshed, the inhabitants of the earth shall mourn, . . . . until the consummation decreed hath made a full end of all nations; that the cry of the saints, and of the blood of the saints, shall cease to come up into the ears of the Lord Sabaoth, from the earth, to be avenged of their enemies."

What motives and purposes do these so-called "revelations" disclose? Do they not point directly at results which this organization has since done much to attain? Are they not calculated to cause distrust and hatred of all who are not of this so-called church? They are of the essence of this so-called church, though those we have copied constitute but a small part of such teachings, and do not touch their plan of organization, polity, and system of government. Yet these may be sufficient to show the temporal features and nature of this "Church of Jesus Christ of Latter-Day Saints," with some of its aims and purposes; and help, with other like teachings, to explain the phenomenon of its history. Those parts we have copied are mixed with much matter apparently merely fustian and meaningless, and not apparently explanatory of the general purpose, as indicated by the extracts. These do not touch the extraordinary teachings of polygamy, or plural or celestial marriage; yet those are also included in the blessings of liberty and the pursuit of happiness. We are not at liberty to say these extracts have no meaning, nor that their true meaning and signification are not indicated by the language used. They speak of other people as "enemies," and evidently imply that their presence, their laws and institutions are to be looked upon as a "curse upon the land," which the church aspires to dominate; that in such land there is to be no government or laws, except those alone of the church—evidently the germ of that state of chronic warfare which that "church" has ever, and still does, maintain against all government save that of the church; that even the members of the "church" are not their own masters. Their individuality as freemen and citizens is denied them. Their rights of choice and of action as freemen are merged in the church. Internecine wars are welcomed as a means by which the "gentiles are to be exterminated." The intent to despoil the unsuspecting people of Ohio, who vainly "called with much trust," among them that

people then seeking a home, and who were giving to those people "much faith," is plainly intimated. The revelations on polygamy and plural or celestial marriage had not then been introduced. They came in 1843, and have since been propagated, with what success the public statutes and records of the courts in some degree show. None of these objectionable features have been expunged or modified, and now license to pursue and realize all these aims is demanded. It is time to speak plainly on this subject. The true interests of this people themselves and all others demand it. The tendency of such principles and purposes is clear. They do not lead to the "security of the blessings of liberty"; but they do lead to its utter subversion. The guaranty of the freedom of speech and of the press is not generally held to be a shield to protect license and crime; nor is there anything in the bare name of religion, when it seeks thus to deal with temporal matters, with the facts and interests of social and political life, that should exempt it from that wholesome rule conceded to license and crime.

We think, if we are at liberty to look at the preamble of the federal constitution, as the appellant asks us to do, as expressing the objects of that instrument, and as an aid in construing its provisions, such expression, applied to the aims and objects of this organization, does not favor the view of the appellant.

But to look further. The question of the validity of the election law has already been before the supreme court of this territory. *Innis v. Bolton,* ante, p. 442, 17 Pac. 264, was a case where a party claiming the right to vote, being challenged, declined to take the oath prescribed in section 504; complying with the law in all other respects, but refusing to take the oath of nonmembership. The right to vote was denied, and he brought an action for damages against the judges of election. Judgment was given for the defendants. The issue was as to the validity of section 504. The reasons for such invalidity were there alleged to be: 1. That the statute is in violation of the first amendment of the constitution; 2. That it is in conflict with the act of Congress of March 22, 1882. On the first point it was urged, as in this case, that to make membership in this organization a test of the right to vote was an infringement of religious liberty, and hence was forbidden. And under the

second, that Congress, in 1882, in the Edmunds act, in declaring that polygamists and bigamists shall not vote in the territory, had covered the whole ground; and that the legislature was precluded from prescribing any further test in any way, however remotely, connected with those crimes. On both of these points the supreme court overruled the appellants. We think the ruling should be followed. While the section of the statute is not the same in the case at bar as in that, yet the two sections are parts of the same act, and the principle involved in the two is practically the same. But while that case has our approval, it may be well in this to say further that several acts have been passed both by Congress and by the territorial legislature, prescribing the qualifications of voters. The act of Congress of March 3, 1863, organizing the territory of Idaho, is one of those acts. By section 5 of the organic act, it was provided that "every free white male inhabitant above the age of twenty-one years, who shall have been an actual resident of said territory at the time of the passage of this act, shall be entitled to vote at the first election, . . . . but the qualifications of voters, and of holding office at all subsequent elections, shall be such as shall be prescribed by the legislative assembly." The legislative power (section 6) was declared to "extend to all rightful subjects of legislation consistent with the constitution of the United States, and the provisions of this act," except as to laws interfering with the primary disposal of the soil, taxing property of the United States, or taxing property of nonresidents higher than property of residents. Those excepted subjects only were forbidden. The legislature exercised this right in 1864, and again, by Revised Laws of 1874, page 684, the law was entirely changed. The law of 1864 was repealed, and one enacted that "all male inhabitants over the age of twenty-one years shall be entitled to vote at any election," provided they be citizens, etc., and have resided in the territory four months, and in the county where they offer to vote thirty days; but no person under guardianship, *non compos mentis,* or insane, nor any person convicted of treason, felony, or bribery, etc., unless restored to their civil rights, shall be permitted to vote at any election.

In the Revised Statutes of the United States, passed at the first session of the forty-third session of Congress, 1873-74, as

further revised and reported September, 1878, provisions on this subject, "common to all the territories," are collated. These provisions differ from that under which the territory was organized, and under which its legislature had acted, up to that time. It is there provided (section 1860) that at all elections after the first "the qualifications of voters, and of holding office, shall be such as may be prescribed by the legislative assembly of each territory," except (1) the right of suffrage and holding office shall belong to citizens, or those who have declared their intention to become citizens, of the United States, over twenty-one years of age, and have taken an oath to support the constitution, etc.; (2) there shall be no distinctions on this subject between citizens on account of color, or previous condition of servitude; (3) no officer, soldier, or mariner, shall, etc., unless he has resided in the territory six months; (4) no person belonging to the army or navy shall hold any civil office. Now, although this act is very full in saying who may and who may not be allowed to vote, nothing is said about persons under guardianship, persons *non compos mentis,* or insane; nor of persons convicted of treason or other crimes; yet no one pretends that this general legislation by Congress affected the *status* of such persons as voters. Congress had only its special purpose in view, and did not cover other ground. But, following that general act, on March 22, 1882, Congress enacted the "Edmunds Law." Its object is expressed to be "to amend section 5352 of the Revised Statutes of the United States, in reference to bigamy, and for other purposes." No part of the act touches the power of the legislature, unless, as counsel claim, the eighth section does. That provides that "no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section, in any territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such territory or other place." In the absence of any expressed intent to repeal the grant of power to the territories, it is not easy to see how this could at all affect such power. It must be borne in mind that the territorial legislature is but a creature of Congress; and while it, for certain purposes, exercises the same power, it acts as a separate political organization. An act · of

Congress is not an act of a territorial legislature, and *vice versa.*
Each may act upon the same subject, from its own standpoint,
and the acts of each may be valid. In such case their powers
are clearly concurrent. But in the act of 1882 the act of Congress does not cover, nor profess to cover, the same ground as
the act of the territory. It does not deal with membership in
any organization as a qualification to vote. The one subject
is not even germane to the other; or, if it has a remote relation,
as is contended, Congress did not choose to enter on the ground
covered by the territorial legislature. The counsel cites, in addition to the Edmunds act, *Houston v. Moore,* 5 Wheat. 22-24;
*Prigg v. Commonwealth,* 16 Pet. 618; *Passenger Cases,* 7 How.
400, and elementary authorities. All the cases cited involve the
relation between the several state governments and the United
States. In them it is a question of which sovereignty has the
power in dispute. Congress exercises powers delegated by the
states. If the former have those powers, the latter, except in
exceptional cases, does not possess them. No such relations of
antagonism exist between Congress and the territories. The
will of Congress and that of the territorial legislatures are not
two distinct wills, within the holding of some of those cases, but
are for certain purposes (of which the act in question is one)
one and the same will. While in their operation they are distinct, there is the relation of superior and inferior in all territorial affairs; and the superior may prohibit or nullify the acts
of the inferior. Until it does so the acts of the inferior are as
valid, within its province, as the acts of the superior. If it were
true (though it is not true) that section 8 of the Edmunds act
covered the whole ground of section 501, and that each was intended as a punishment for the same offense, under the authority cited by the appellant (*Houston v. Moore,* 5 Wheat. 23), it
would seem that the combined acts would be only concurrent,
and that both would be valid. (See, also, *Innis v. Bolton,* ante,
p. 442, 17 Pac. 264.) But it is not necessary to go to the extent
indicated in that case as the two acts do not cover the same
ground. After a careful consideration of this case, we do not
find the act of the territorial legislature in conflict with any
provisions of the federal constitution, or with any act of Congress. The ruling and the judgment of the court below must be
affirmed.